20-778 United States of America v. Sainfil Just to clarify the rules of the road. If you are at the podium, you have the option, you may keep your mask on or you may remove it as you like. The one thing I would ask, no matter what, is please stand centered on the podium and either raise or lower the podium as needed so that the microphones are close to you and that way we can hear you better. Keeping in mind that we're also streaming the audio, so even if we can hear you if you were standing on the side, your adoring public could not hear you if you don't speak into the microphone. Now, Mr. Rayfield, I understand you would like to reserve two minutes for rebuttal. Is that right? Yes, Your Honor. Okay, please proceed. Thank you. May it please the Court, Mike Rayfield on behalf of the appellant. Mr. Sainfil's counsel was ineffective for two independent reasons. He didn't move to suppress Mr. Sainfil's statement to the FBI and he then conceded the most damaging possible inference from that statement. Now, the dispute about the suppression motion is actually, we think, very narrow. Everyone agrees that when Mr. Sainfil made his incriminating statement, he was in federal custody and had not been given Miranda warnings. So therefore, everyone also agrees, I think, that if Agent Wonderland had posited Mr. Sainfil's guilt during that exchange, the statement would have had to be suppressed under Rhode Island v. Innis. And that's exactly what he did. He flatly accused Mr. Sainfil of robbery. He said that the FBI knew that he was, quote, involved in the bank robbery and that, quote, you were involved as a lookout while your friends were inside the bank, you were outside. But your client asked at least twice for an explanation. So your client may have elicited that. Mr. Sainfil asked why he was being arrested. And so that permitted Agent Wonderland to say what he said first. First, he said, you'll hear all about it when we get back to the station because that's how we do things. And then the client asked again. And it's hard to fault somebody for answering a question posed twice. Well, all Mr. Sainfil did was ask why he was arrested. And then at that point, Agent Wonderland correctly said, you were arrested in connection with the Rhode Island v. Innis for bids is what Agent Wonderland did next, which is to posit Mr. Sainfil's guilt. Miranda tells us exactly why this specific tactic is so problematic, regardless of how it's initiated. Miranda says, quote, when the guilt of the subject is posited as a fact, this aura of confidence in his guilt undermines his will to resist. He merely confirms the But how prejudicial is that when he basically said the same thing by a shrug when he was back at the police station? Well, the two statements are, in our view, entirely different. At the police station, all he did was shrug and deny that he was involved in the bank robbery. The damaging statement was from the first exchange, where Mr. Sainfil said, just because I was outside the bank doesn't mean I robbed it. And the words, I was outside the bank, is what the government used during both its opening and closing statements. During opening, it said, we're going to prove this case with defendant's own words, because you're going to hear that when he was arrested, he admitted to being outside the bank during the robbery. But isn't this, I keep thinking this is a My Cousin Vinny situation, right? Where you could have argued, or the defense could have argued, well, he wasn't conceding that he was outside the bank. He was just saying, well, hypothetically, just because somebody's outside the bank doesn't mean that they were involved in the robbery that was inside the bank. And the government could argue, no, no, no, this wasn't a hypothetical statement on his part. It was a concession that he was outside. And then you argue back and forth. But that doesn't make the confession any less damaging. Yes, we agree. But it seems to me that you can make that same argument. The defense can say this is a Cousin Vinny situation as to the first and to the second statements, the post-Miranda and the pre-Miranda. And the government can say, no, both of those were concessions. I understand the government was arguing, look, both of these were admissions by the defendant. And it seems the defense was in a situation to say, no, no, neither one was a concession. Yes, we agree that there was some ambiguity in the first statement, which is why, getting to my second point, which is why counsel's concession during opening statements was so damaging. So can I ask a procedural question there? I can understand how, if the government's right on the concession, we could say, well, look, even if that wasn't a great idea, it fell within the realm of reasonable performance in a sort of objective sense. And it's not ineffective. But would you be able to win on this procedural posture? Or would there need to be additional fact-finding under, say, Massaro, where it would need to be raised in a 2255? And I know it was raised before the District Court earlier. But wouldn't you need to have an evidentiary hearing where you heard from the defense lawyer to say, well, why did you do that? And one can imagine any number of scenarios. Number one, well, I talked to my client, and he wanted to do this. Or number two, I knew about other evidence that's not in the record that would come out if I didn't make the concession. Or I don't spin out any number of theories. And isn't that generally why you don't find deficient performance without hearing from the defense lawyer to see, well, what was your decision-making process? So I think Your Honor's question is assuming that you disagree with us on the Miranda issue. Again, just hypothetically. Yeah. So just not to fight that hypothetical, if that were on the table, then we would say, under this Court's decisions, the record is clear enough to make a decision on the ineffective assistance claim. But how is it clear enough to know what was motivating the strategic analysis of the defense lawyer? That's what I don't know. Right. So we would say that if the motion was meritorious, and given what we know in the record, any decision to concede this point was unreasonable, regardless of what counsel said. Yeah. Assume it's not meritorious. Take that away and just focus on the concession. Assuming that your ineffective assistance claim were premised entirely on the concession, how is that something that we could decide without having heard from defense counsel, as you do at these sorts of things? And it typically happens in a 2255 context, where you have a new lawyer. I think you can decide that question based on what actually happened at the trial. As Your Honor has been saying, before the concession, Mr. St. Phil could have at least tried to point to some ambiguity in his statement to the FBI. But the concession effectively left Mr. St. Phil with only one remaining defense, which was that he was at the crime scene, but only by coincidence. And the government correctly described that theory as preposterous. So you can tell what happened based on just what happened at trial. The defense made this concession. Once he made it, he couldn't do anything to contest Mr. St. Phil's presence at the crime. And all of this was enormously prejudicial, especially in light of our view that the evidence wasn't just not overwhelming. It was insufficient. What makes this case so unusual is that the government's evidence ended up affirmatively disproving its case. The government promised the jury that it had a video of the person who was the lookout at the robbery. But when the government showed the jury the video, the defense was able to prove that the person was not even the same race as Mr. St. Phil. That's the debate, right, is going to be how much the video showed and how much the video was really probative. And even if the person in the video wasn't your client, well, maybe Mr. St. Phil was simply outside the scope of the video. Let me ask you this. Isn't it the kind of question that a defense lawyer would generally be entrusted to decide whether they're going to put all their eggs in one basket or in multiple baskets before the jury? So, for example, would a defense lawyer not be entitled to say, well, I could have my theory of the case. My client wasn't there. But even if he was there, he didn't have anything to do with the robbery. But by presenting alternative theories, you look too defensive, right? You look insecure in your position. And therefore, it is a better defensive tack to narrow to everything and say, well, look, sure, I was there, but I had nothing to do with the robbery, you know, instead of having alternative fallback defenses, because sometimes that's perceived as inherently contradictory. So I guess what I'm wondering is, you know, maybe in hindsight, that's not, that wasn't the best argument. Maybe it was, maybe it wasn't available. But isn't that really what we're debating? Your Honor, I certainly agree that in certain circumstances, that could be a reasonable strategy. Under this circumstance, where what that, it's not. Because the only possible result of that strategy is you have to essentially take everything else the government's saying is true. He was involved in the planning. He was involved in the, in the, in the, he was at the robbery. He was scoping out the cards. But, but somehow, he, he's still not guilty. This near presence theory that, that it, it really didn't hold up. And I think the government correctly described it as absurd at, during closings. But it was the only thing left for the defense to do. Okay. Thank you very much. We'll hear from the government. And again, just to let everybody know, you're welcome while you're at the podium to take your mask off or not. And then when you sit back down, you put it on. Sorry, we go back and forth, but we appreciate your patience with our system. Thank you. May it please the court, my name is Assistant United States Attorney Mark Mazur. I'm an Assistant United States Attorney in the Eastern District of New York. And I was one of the trial attorneys on the underlying matter. That's before your, your honors today. Beginning with the second point first, that counsel just raised. The matter of this big concession that the defendant was at the scene of the bank robbery. I would start by just noting, it's noteworthy in terms of the context of the charge to the jury. The jury was charged under Pinkerton theories, as well as aiding and abetting theories. And that was for all three counts. So in terms of this being a major concession, the jury was equipped through those charges to find the defendant guilty without him being present at all. So that's in terms of the evidence that you have, the concession, or the jury say relying on the video evidence you put in. Would it be accurate to say that all of the evidence of Mr. Sanfield's involvement came from cooperating witnesses? Well, there certainly were four cooperating witnesses who gave detailed testimony about Mr. Sanfield's involvement. But you also did have the independent, independent evidence of the 323 number. Now that was linked to the testimony of a cooperator. Saying that they kind of remembered that he might have had that kind of area code once upon a time? I believe Ovell Gahagan said at the time he knew him to have a 323 number and he knew the number at the time. It's just true. Right, but he didn't remember it at the time of the trial, right? Of course, but I believe he did say he did know it at the time. But yes, the 323 number would be without ever finding that the defendant was at the bank based on the Pinkerton and aiding and abetting theories of the case. In terms of the commentary or dialogue between Special Agent Wonderland and Mr. Sanfield, I would point out that there is a major distinction in terms of the facts between that and even Innis, which was held appropriate, and that is the defendant Sanfield, in this circumstance, he's the one who began the dialogue with Wonderland. So Wonderland's response of you're being arrested after Sanfield persisted, you're being arrested for a bank robbery, and you're being arrested because you were the lookout in that bank robbery, I believe in our brief, it was an inadvertent at best comment. It's probably not the best comment, but if you look at the factors in Innis now, so assuming it constituted interrogation, which obviously the government doesn't believe it did, the entire ride to the FBI office lasted 15 minutes. Sanfield was then Mirandized, and with that shoulder shrug statement, again conceded the exact same thing. When Wonderland asked him or told him you were at the bank, the shrug coupled with the it doesn't mean I robbed it, it's a concession that he was there yet again. And I think everybody seems to be in agreement, it was no more than a few sentences at best in the car, and no more really than a few sentences at best before he invoked. Given that small universe, there was really no time or facts to suggest that Wonderland has thought of some grand two-step process for the interrogation. And again, noting the big distinction here, Sanfield started the interrogation, he handcuffs you, you ask, what did I do? Because you know, if you just say, okay, you were in my hands, so handcuff me and put me in the car, and you don't ask, that's telling. It's actually, it's more than human nature can be expected to do. I understand that the knee jerk reaction may very well be to ask why you're being arrested, but there's just nothing improper about Wonderland responding in the fashion that he did. He's being asked a question, he provided, he attempted to essentially tell Sanfield, wait, you'll find out when we get back to the office, but then he responded. He continued giving that answer. His suggestion that you were, you were the lookout at this bank robbery is, I think, designed to elicit some kind of response or admission, but the question is whether, to me, the question is whether the subsequent admission via shrug is tantamount to saying the same thing. I mean, from the government's perspective, it's exactly the same thing. When he says, when he answers the question with the shrug and then saying essentially, but it doesn't mean I robbed the bank, it implies that he was at the bank. What rationale can be posited for defense counsel standing up and saying, all right, you'll hear it. He was there. He's, from the government's perspective, he's leaning into what four cooperators are about to testify to. It's one thing to say that four cooperators testified that the defendant was present, but some of the facts and details, as argued by the government and the jury ultimately credited, is you have government cooperators talking about how they were surveilling Shibwana Moon, how they were looking into ATM codes at that bank. The level of detail that those cooperators provided, it would be hard press for any defense attorney to get up and essentially be able to overcome all of those. It was said earlier that one of the better attacks in a case like this might be to, in fact, put all your eggs in one and say, it's not that, but okay if you don't believe that. The problem is that he bought into half of the cooperating testimony, the cooperating witnesses testimony, right? And then once you dignify their testimony with a concession, then it becomes hard to unpeel it, right? And say, well, yeah, all of them happen to corroborate this fact that is true, but now some of the things they said are not true. It does seem like a pretty tough concession if the Mirandai statement doesn't come in particularly. I mean, isn't that, that's a pretty aggressive concession. Well, I mean, the defense attorney in this case was presented with a set of facts that I believe suggested overwhelming guilt here. He's got to come up with a way to sort of parse through this and offer a defense. And that's, I'm not saying everybody would have agreed to that strategy, but I don't think you could qualify that and say there's no rationale whatsoever for that strategy. Assuming that you can not withstand your adversary's attacks on the conviction, what was the effect of these enhancements? Did they affect the sentence appreciably? It moved the guidelines. It definitely moved the guidelines. What is there that supported the enhancement for body armor? Because this defendant didn't wear it. In fact, only one of the people who entered that bank wore it. So how could it have been foreseeable? Well, we would point to the October 9th, 2015, the attempted robbery, as well as the planning at Marcy's house on the day of the actual robbery. Cooperating witness Marcus Wells was putting the body armor on in front of all of the other individuals, well, at the same location as all the other individuals where Mr. Sainthill was present. The same location being what? An apartment house? Being Marcy's house. All right. So in the same house. That doesn't mean in the presence of Mr. Sainthill. Well, I believe the testimony was they were present. Mr. Sainthill was present in that house. Approximately an hour before he went out to scout the bank. And I believe at that point, it becomes that reasonably foreseeable. If it's so foreseeable, how come only one of the five people was wearing body armor? I can't speak to whether or not people have body armor. No, you said it just suggests it's not really foreseeable. Well, I can't speak to whether or not they had access to more body armor. We do know Wells had access and decided to wear it. But if the defendant, Sainthill, is there, he may have actual knowledge as well as what the government would believe is reasonably foreseeable when you're in a house, they're picking up AK-47s, they have firearms, they have zip ties, and people are putting on body armor to essentially storm a bank. So is your argument, as I understand it, not that in any case where there's a daylight armed robbery of a bank, it will always be foreseeable, as your adversary argues, it would always be foreseeable if you adopt the district court's view that there's going to be body armor and zip ties. But here, where there was extensive testimony that there was joint planning, in fact, twice, once for an aborted robbery of this bank, and then a second time when they all got back, and that all of the planning was happening in the same location, this Marcy's house, that because of the extensive evidence of joint planning, it's a reasonable inference that all of the things that they were all doing were known to one another, even if you didn't have particular testimony about each person's knowledge about every little step. Correct, Your Honor. We're not suggesting in any way that any armed bank robbery or any takeover bank robbery automatically qualifies with they might have body armor, but because of what you just mentioned, it is foreseeable. I think we've heard your argument. Thank you. Mr. Rayfield, I believe you have reserved two minutes for rebuttal. Thank you, Your Honor. Just three points from me. So first, just to address the government's point about the jury instructions and the Pinkerton charge, it is true that the jury did not need to make a finding that he was outside the bank in order to convict, but that was the heart of the government's case, and if the jury had agreed, had found, had decided that he was not outside the bank, it would necessarily have had to find that at least three of the cooperating witnesses were lying, which would cast doubt on all of their testimony. Now, as for the point that he initiated the conversation, I haven't seen a case, I don't think, where that has been found to make a difference, and in fact, in many of the cases that, applying Innis, the suspect is sometimes given Miranda warnings, invokes their right to counsel, and then the police come back and reinitiate a conversation. The only question under Innis is whether the statement by the police is an incriminating response. Keep in mind that the default rule here is you give the, you give Miranda warnings. If you don't give Miranda warnings, the suspect is in a position where they're going to be very, what's the word, where they're going to feel compelled to explain themselves, compelled to engage. And finally, just to close out with the shrug exchange, if the police only had that exchange, I don't see how the government could have stood up in closing, in opening statements, and said, we're going to prove the case with the defendant's own words, because you're going to hear that after he was arrested, the defendant admitted to being outside the bank. There's no way they would have that argument available if all he was the shrug. The damaging aspect of the exchange was the first, I'm sorry, the first exchange where he said the words, I was outside the bank. And then at closings, the government went back to this. Was he there? Admission to Agent Wonderland, you even heard counsel open, he was there. This was an enormously prejudicial confession and concession. And the case, in our view, especially in light of the video, would have been eviscerated if the government didn't get these submissions. And so the court should reverse the judgment of conviction or order a new trial. Thank you. Thank you very much to both of you. Very helpful argument. We will reserve decision.